IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **NEDYALKO M. VARTELOV** | : | **CIVIL ACTION** |
| | : | |
| v. | : | |
| | : | |
| **MONTGOMERYVILLE ACURA** | : | **No. 21-5226** |

MEMORANDUM

**Schiller, J.**                                                                                                                                                                  **April 24, 2023**

      Plaintiff Nedyalko Vartelov sues Defendant Montgomeryville Acura ("the Dealer") alleging it violated the Odometer Act and Pennsylvania's Uniform Trade Practices and Consumer Protection Law ("UTPCPL") and committed fraud during the sale of a used vehicle. The Dealer moves for summary judgment on the Odometer Act claim, and the parties cross move on Vartelov's UTPCPL and fraud claims. The Court grants summary judgment in the Dealer's favor on the Odometer Act claim. It declines to exercise supplemental jurisdiction over Vartelov's remaining state law claims and dismisses them without prejudice to refile in state court should Vartelov chose to do so. The parties' cross motions on the state law claims are denied as moot.

**I.**       **BACKGROUND**

      The Dealer received a new 2020 Acura TLX ("the Vehicle") with four miles on its odometer on or about July 20, 2020. (ECF 25-11 at 1-2.) A few weeks later, the Dealer took title of the Vehicle and made it a corporate fleet vehicle. (*Id.*). It loaned the Vehicle to its service customers when they received a longer service or certain warranty repairs on their vehicles. (ECF 24 at 156, Marr Dep., 26:15-17; ECF 24 at 140, Grimason Dep., 11:9-20.)

### The Vehicle's prior use as a loaner.

The Dealer and each customer using the Vehicle entered into a loaner agreement (titled "Vehicle Use Agreement") generated by a service department service advisor. (ECF 24 at 141, Grimason Dep., 16:12-13, 17:4-9; (ECF 24 at 157, Marr Dep., at 31:19-32:2; *see also* ECF 24 at 184-242 (Ex. J).) The Vehicle Use Agreement contains the customer's identifying information, the date and time the customer took possession of and returned the Vehicle, and the Vehicle's mileage when taken and returned, among other things. (ECF 24 at 184-242 (Ex. J).) Once the borrowing customer returned the Vehicle, a lot attendant went "out to the vehicle, check[ed] it in, and fill[ed] out a little form with the fuel, he vacuum[ed] the vehicle, check[ed] it for damage, and then put[] the current mileage for the vehicle" on the check-in form and the Vehicle Use Agreement. (ECF 24 at 158, Marr Dep., 35:9-21; ECF 24 at 184-242 (Ex. J) (Vehicle Use Agreements and Check In forms for the Vehicle).) A service advisor then logged this information into the computer system to "close out" the rental contract. (ECF 24 at 157-58, Marr Dep., 31:22-32:2, 33:19-33:23.) The computer system can then generate a report for the Vehicle's usage history by drawing solely upon the information entered into the computer. (ECF 24 at 156, Marr Dep., 27:5-28:23; *see also* ECF 24 at 171-73 (Ex. H).)

Thus, there are three sources of data for the Vehicle's mileage during its time as a loaner: the computer-generated Vehicle usage report; the Vehicle User Agreements; and the check-in forms. (ECF 24 at 184-242 (Ex. J) (Vehicle Use Agreements and check-in forms); ECF 24 at 171-73 (Ex. H) (computer-generated report.) The following chart summarizes the information contained in the summary judgment record for the Vehicle's loaner usage:

| | Exhibit H<br>Computer generated report | | | | Exhibit J<br>Vehicle Use Agreement | | | | Exhibit J<br>Check in form | |
|---|---|---|---|---|---|---|---|---|---|---|
| Customer last name | Date out | Date in | Miles out | Miles in | Date out | Date in | Miles out | Miles in | Date | Miles |
| Bhatt | 07/25/20 | 08/05/20 | 4 | 159 | | | | | | |
| Yates | 08/05/20 | 08/06/20 | 159 | 216 | | | | | | |
| Smith | 08/06/20 | 08/10/20 | 216 | | | | | | | |
| Jang | 08/11/20 | 08/11/20 | 216 | 305 | | | | | | |
| Snellings | 08/12/20 | 08/12/20 | 305 | 306 | 08/12/20 8:08 AM | 08/12/20 4:01 PM | 305 | 315 | 08/12/20 4:01 | 315 |
| Yu | 08/13/20 | 08/14/20 | 306 | 307 | 08/13/20 10:21 AM | 08/14/20 7:30 | 306 | 329 | 08/14/20 7:30 | 329 |
| Adler | 08/14/20 | 08/15/20 | 307 | 3330 | 08/14/20 8:32 AM | 08/14/20 11:01 | 307 | 337 | | |
| | | | | | 08/14/20 8:32 AM | 08/15/20 7:30 AM | 307 | | | |
| Herishko | 08/15/20 | 08/15/20 | 3330 | | 08/15/20 9:02 AM | 08/15/20 11:01 AM | 3330 | | | |
| Lakkakula | 08/17/20 | 08/17/20 | 3330 | | 08/17/20 8:35 AM | 08/17/20 3:00 PM | 3330 | | 08/17/20 3:43 | 370 |
| OSullivan | 08/17/20 | 08/18/20 | 3330 | 4911 | 08/17/20 3:36 | 08/18/20 4 PM | 3330 | 491 | 08/18/20 4:00 | 491 |
| Schenck | 08/19/20 | 08/20/20 | 4911 | | 08/19/20 7:37 AM | 08/20/20 11:07 | 4911 | 513 | 08/20/20 11:07 | 513 |
| Randall | 08/20/20 | 08/21/20 | 4911 | | 08/20/20 2:41 PM | 08/21/20 2:00 | 4911 | 574 | 08/21/20 2:00 | 574 |
| Pfenninger | 08/25/20 | 08/26/20 | 4911 | 4912 | 08/25/20 9:44 AM | 08/26/20 10:30 | 4911 | 584 | 08/26/20 10:30 | 584 |
| Kolisetty | 08/27/20 | 08/27/20 | 4912 | | 08/27/20 7:42 AM | 08/27/20 3:45 | 4912 | | | |
| Lemailloux | 08/28/20 | 08/30/20 | 4912 | 4912 | 08/28/20 1:02 PM | 09/03/20 8:17 | 4912 | 1025 | 09/03/20 8:17 | 1025 |
| Gower | 09/04/20 | 09/04/20 | 4912 | 4913 | | | | | | |
| Dixon | 09/04/20 | 09/14/20 | 4913 | | 09/04/20 12:02 PM | 09/14/20 8:45 | 4913 | 1219 | | |
| Bailey | 09/14/20 | 09/17/20 | 4913 | | 09/14/20 12:03 PM | 09/17/20 8:17 AM | 4913 | 1275 | 09/17/20 8:17 AM | 1275 |
| McClean | 09/22/20 | 09/25/20 | 4913 | 4914 | 09/22/20 9:14 AM | | 4913 | 1305 | 09/23/20 | 1305 |
| Chiarappa | 09/28/20 | 09/29/20 | 4914 | 4915 | 09/28/20 9:12 AM | 09/28/20 7:51 | 4914 | 1359 | 9/28/20 7:51 | 1359 |
| Scanlin | 10/01/20 | 10/03/20 | 4915 | 4916 | 10/01/20 8:04 AM | 10/02/20 1:48 | 4915 | 1501 | 10/02/20 1:48 | 1501 |
| Campbell | 10/07/20 | 10/09/20 | 4916 | | 10/07/20 11:12 AM | 10/09/20 1:25 | 4916 | 1520 | 10/09/20 1:25 | 1520 |

| Harrison | 10/12/20 | 10/13/20 | 4916 | | 10/12/20 12:09 PM | 10/13/20 3:25 | 4916 | 1569 | 10/13/20 3:25 | 1583 |
|---|---|---|---|---|---|---|---|---|---|---|
| Kulkarni | 10/14/20 | 10/14/20 | 4916 | | | | | | | |
| Arena | 10/15/20 | 10/16/20 | 4916 | 4917 | 10/15/20 7:55 AM | 10/21/20 2:19 | 4916 | 1799 | 10/21/20 2:19 | 1799 |
| Coons | 10/16/20 | 10/21/20 | 4917 | | | | | | | |
| Birchler | 10/22/20 | 10/29/20 | 4917 | 4919 | 10/22/20 4:26 PM | 10/24/20 1:07 | 4917 | 1828 | 10/24/20 1:07 | 1828 |
| Miller | 10/30/20 | 11/1/20 | 4919 | 4920 | 10/30/20 7:59 AM | 11/06/20 11:00 AM | 4919 | 1900 | 11/06/20 11:00 | 1900 |
| Bollenbach | 11/9/20 | 11/10/20 | 4920 | | 11/09/20 8:34 AM | 11/10/20 12:45 | 4920 | 1930 | 11/10/20 12:45 | 1930 |
| Lin | 11/13/20 | 11/14/20 | 4920 | 4921 | 11/13/20 8:27 AM | | 4920 | 1944 | 11/16/20 11:31 | 1944 |
| Stillman | 11/17/20 | 11/17/20 | 4921 | | 11/17/20 7:35 AM | 11/16/20 | 4921 | 1963 | | |
| Gallagher | 11/18/20 | 11/19/20 | 4921 | | | | | | 11/19/20 4:25 PM | 1985 |
| Shohet | 11/20/20 | 12/02/20 | 4921 | | 11/20/20 12:32 PM | 12/02/20 11:50 | 4921 | 2001 | | |
| Le[1] | 12/09/20 | 01/05/21 | 4921 | 4921 | 12/09/20 11:29 AM | | 4921 | | | |

During its service as a loaner, thirty-four customers drove the Vehicle. Customer Le last "rented" the Vehicle in December 2020 and returned it on January 5, 2021. (ECF 24 at 173 (Ex. H).) A few days after Customer Le returned it, on or around January 9, 2021, the Dealer performed a used vehicle inspection, and the Vehicle's mileage was 2,776. (ECF 24 at 160-61, Marr Dep., 41:21-42:19, 48:11-15; ECF 25-12.) The Dealer did not loan the Vehicle again after the inspection. (ECF 24 at 161-162, Marr Dep., 48:7-50:1.)

**Vartelov purchases the Vehicle.**

Vartelov found the Vehicle online and texted Salesman Scott Sabulsky about purchasing it. (ECF 24 at 59, Vartelov Dep., 99:3-7; ECF 24 at 89-90, Sabulsky Dep., 8:11-14, 9:3-7.) Vartelov ultimately purchased it from the Dealer with Sabulsky's assistance on June 7, 2021—

---

[1] Information regarding this customer was derived from ECF 25-5.

approximately five months after its used vehicle inspection. (ECF 24 at 29 (Ex. A); ECF 24 at 40-41, Vartelov Dep., 25:17-19, 27:14-28:6, 28:11-19; *id.* at 43-44, Vartelov Dep., 37:3-39:12; *id.* at 99, Vartelov Dep., 99:3-7; ECF 24 at 89, Sabulsky Dep., 8:2-9:7.).[2] He paid $35,888.000 for the Vehicle but financed $40,236.10 with Citadel after taxes, fees, his trade-in allowance, and his outstanding loan on his trade-in vehicle. (ECF 24 at 29 (Ex. A); ECF 24 at 42, Vartelov Dep., 30:1-32:12).

In conjunction with the sale, Vartelov reviewed and signed various documents, including: a Retail Purchase Agreement, a Motor Vehicle Installment Sale Contract, an Acura Certified Pre-

---

[2] The parties apparently dispute whether the Vehicle was a "certified pre-owned vehicle." This fact is immaterial to the Court's resolution of the parties' pending summary judgment motions because none of Vartelov's claims are premised on a purported representation the Vehicle was a certified pre-owned vehicle, and Vartelov cannot amend his already once-amended pleading in a motion for partial summary judgment. (ECF 15 (Amended Complaint); *see also Pennsylvania. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) (holding complaints cannot be amended by briefs in opposition to a motion to dismiss.)

Yet, Vartelov produces an expert report from purported expert Robert Salmon in support of his partial motion for summary judgment opining the Vehicle is not a certified pre-owned vehicle because the inspection checklist used to certify it as such "was not presented nor any other supporting Acura certification documents at the time of sale which disqualifies it as an Acura CPO vehicle." (ECF 25-10 at 4, 12 (confirming document referenced is the 182-point inspection checklist).) This conclusion is belied by Vartelov's testimony he reviewed, signed, and received the checklist at the time of sale. (ECF 24 at 43-44, Vartelov Dep., 37:3-39:12; *see also id.* at 105-106, King Dep., 21:11-24:3.) The Court need not determine whether the car was in fact a certified pre-owned vehicle, because as discussed above, this fact is immaterial to Vartelov's claims.

It is worth noting, though, that both parties in this litigation provide deposition transcripts with **no exhibits** attached to them. Montgomeryville Acura does not provide the 182-point checklist in its appendix. (ECF 24.) And despite Vartelov clearly having the **full** certified pre-owned inspection report in his possession from discovery in this case (ECF 24 at 43-44, Vartelov Dep., 37:3-39:12), he only includes the first three pages of the report in his appendix (apparently the same portion provided to his expert leading to the expert's conclusion the Vehicle is not a certified pre-owned vehicle). (ECF 25-12 at 1-3 (182-point inspection checklist conspicuously missing page four of the four-page document where Vartelov, and the dealership representatives, signed as confirmed by sworn testimony) (ECF 24 at 43-44, Vartelov Dep., 37:3-39:12; ECF 24 at 105-106, King Dep., 21:11-24:3.)

5

Owned Inspection Checklist, an Odometer Disclosure Statement, and a CARFAX report. (ECF 24 at 41-44, 62 Vartelov Dep., 27:14-28:6, 33:22-36:7, 37:3-39:12, 39:22-41:8, 110:7-111:23; ECF 25-12.)[3] He did not ask any questions about the documents, nor did he ask Sabulsky any questions about the Vehicle. (ECF 24 at 41-44, 59, Vartelov Dep., 27:14-28:6, 33:22-36:7, 37:3-39:12, 39:22-41:8, 99:3-7.)

While Sabulsky sold Vartelov the Vehicle, he did not prepare, or present Vartelov with, the Retail Purchase Agreement. (ECF 24 at 91, Sabulsky Dep., 12:4-17:9.) Rather, Garret King, the finance manager, prepares, signs, and finalizes paperwork with customers, including for the transaction with Vartelov. (ECF 24 at 102, King Dep., 8:3-24; *id.* at 104, King Dep., 17:12-18:8.) King did not mark a "prior use disclosure" on Vartelov's purchase agreement, but he did select "used" to indicate the Vehicle was used, not new. (ECF 24 at 29 (Ex. A); ECF 24 at 113, King Dep., 56:9-58:18.)[4] The Dealer never checks a box in the prior use disclosure section of a purchase agreement. (ECF 24 at 113, King Dep., 58:12-18.) While Sabulsky knew the Vehicle had been used as a loaner for the dealership at the time of sale, Vartelov, did not know and believed he was "buying the vehicle with one previous owner." (ECF 24 at 91, Sabulsky Dep., 16:5-14; ECF 24 at 156, Marr Dep., 26:14-17; ECF 24 at 61-62, Vartelov Dep., 109:1-5, 109:19-110:5.) The Retail Purchase Agreement and the Odometer Statement, both of which Vartelov signed, indicate the Vehicle had 2,776 miles on it at the time of sale. (ECF 24 at 29 (Ex. A); ECF 24 at 135 (Ex. E).)

---

[3] The Court again notes none of these documents were provided as exhibits to the transcript. All but the Motor Vehicle Installment Sales Contract appear in the parties' appendices (ECF 24 at 29 (Ex. A), 135 (Ex. E); ECF 25-12 (inspection checklist missing last page)); *but see* ECF 15 at Ex. A (Motor Vehicle Installment Sales Contract appended to amended complaint as Ex. A.)

[4]

| YEAR | MAKE | MODEL | COLOR | STOCK NO. |
|---|---|---|---|---|
| 2020 | ACURA | TLX | MAJESTIC BLACK | RA7198 |
| VIN/SERIAL NO. 19UUB2F45LA005955 | | ODOMETER READING ☐ Not Accurate  2776 | SALESPERSON SCOTT SABULSKY | |
| THE VEHICLE IS: ☐ NEW  ☒ USED | PRIOR USE DISCLOSURE: ☐ DEMONSTRATOR  ☐ EXECUTIVE  ☐ PRIOR LEASE  ☐ PRIOR RENTAL  ☐ OTHER | | | |

**Vartelov discovers an old Vehicle Use Agreement leading to the instant lawsuit.**

After purchasing the Vehicle, Vartelov found a Vehicle Use Agreement in its glove box indicating the Vehicle had 4,921 miles on it in December 2020 even though the paperwork associated with his June 2021 purchase recorded the mileage at the time of sale as 2,776. (Ex. 25-5; Ex. 24 at 48, Vartelov Dep., 56:8-19.) Aside from this discrepancy, Vartelov has not had any issues with the Vehicle. (ECF 24 at 45, Vartelov Dep., 44:12-14.) Nevertheless, he wanted to trade it in after he discovered "the odometer problem," testifying "[o]nly God knows how many people was driving [*sic*] [the Vehicle]" and he is not "comfortable with that." (ECF 24 at 45, Vartelov Dep., 47:12-21.) But he has not attempted to trade it in yet. (*Id.* at 47:22-23.) Instead, he filed the instant lawsuit alleging the Dealer violated the Odometer Act and UTPCPL and committed fraud during the sale of the Vehicle.

## II.     LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those 'that could affect the outcome' of the proceeding, and 'a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party.'" *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011)). "Summary judgment is appropriate only if, after drawing all reasonable inferences in favor of the non-moving party, there exists 'no genuine dispute as to any material fact' and the movant 'is entitled to judgment as a matter of law.'" *Moyer v. Patenaude & Felix, A.P.C.*, 991 F.3d 466, 469 (3d Cir. 2021) (quoting *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 770 (3d Cir. 2018)).

"The party seeking summary judgment 'has the burden of demonstrating that the evidentiary record presents no genuine issue of material fact.'" *Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016) (quoting *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015)). "Although the initial burden is on the summary judgment movant to show the absence of a genuine issue of material fact, the burden on the moving party may be discharged by showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case when the nonmoving party bears the ultimate burden of proof." *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004) (citing *Singletary v. Pa. Dept. of Corr.*, 266 F.3d 186, 192 n.2 (3d Cir. 2001) then *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (internal quotations omitted)). If the movant carries its burden, "the nonmoving party must identify facts in the record that would enable them to make a sufficient showing on essential elements of their case for which they have the burden of proof." *Willis*, 808 F.3d at 643 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "If, after adequate time for discovery, the nonmoving party has not met its burden, pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against the nonmoving party." *Id.* (citing *Celotex Corp.*, 477 U.S. at 322-23). "This standard does not change when the issue is presented in the context of cross-motions for summary judgment." *Auto–Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (quoting *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987)).

### III. ANALYSIS

Vartelov sues the Dealer for failing to inform him the Vehicle was used as a loaner[5] and Odometer Act violations, including "tamper[ing] with the Odometer of the [V]ehicle, causing

---

[5] (ECF 15 ¶¶ 36-39, 43-45.)

mileage readings at the time of sale to be substantially (30-40%) less than in several months preceding the sale" and for its purported failure to provide required disclosures.[6] The parties cross move for summary judgment on Vartelov's UTPCPL and fraud claims, and the Dealer moves on the Odometer Act claim. The Court grants the Dealer's motion on the Odometer Act claim, the only claim providing the Court with original jurisdiction. The Court declines to exercise supplemental jurisdiction over the remaining state law claims, dismisses them without prejudice, and denies the remaining cross motions for summary judgment as moot.

### A. The Court grants the Dealer's Motion for Summary Judgment on the Odometer Act claim.

The Dealer moves for summary judgment on Vartelov's Odometer Act claim arguing: (1) he fails to identify which part of the Odometer Act it purportedly violated and there is no evidence of a violation; (2) the Vehicle was not driven 4,921 miles as represented on the Vehicle Use Agreement Vartelov found in his glove box because, although the Vehicle usage report shows the Vehicle was driven 3,323 or 1,581 miles in one day, it is impossible to do so causing inaccurate mileage readings on the report; and (3) the Dealer did not act with intent to deceive. (ECF 24 at 15-20.) Vartelov responds in one paragraph arguing the Court should not grant summary judgment because none of the Dealer's employees deposed could confirm under oath that 2,776 miles was the accurate odometer reading when Vartelov purchased the Vehicle. (ECF 27 at 11-12.)

---

[6]   (ECF 15 ¶ 6; *id.* ¶¶ 28, 30 ("In the case at bar Defendant has knowingly tampered with the odometer of the said vehicle sometime between December 2020 and June 2021 when it was sold to the Plaintiff, causing the odometer to show mileage falsely lower by several thousand miles, which on this vehicle was likely 50% decrease from the true mileage" causing "economic ascertainable damages in decreased value of the vehicle, artificially inflated vehicle price, opportunity lost on other comparable vehicles that have not been tampered with, registration and other fees charges in subsequent trade in forced by the actions of the Defendant."); *id*. ¶¶ 34-35, 46.)

Vartelov's argument is contradicted by the record and does not preclude summary judgment. The Court grants the Dealer's Motion because there is no evidence of an Odometer Act violation.

Congress passed the Odometer Act "to prohibit tampering with motor vehicle odometers" and "to provide safeguards to protect purchasers in the sale of motor vehicles with altered or reset odometers." 49 U.S.C. § 32701(b); *see also Owens v. Samkle Auto. Inc.*, 425 F.3d 1318, 1322 (11th Cir. 2005). The Act allows civil actions if a person violates it or the corresponding regulations "with intent to defraud" and awards "[three] times the actual damages or $10,000 whichever is greater" as well as costs and attorney's fees to the individual plaintiff if he prevails. 49 U.S.C. § 32710(a)-(b). Consistent with the Act's stated purposes, it imposes odometer disclosure requirements when transferring a vehicle's title (*see* 48 U.S.C. § 32705(a); 49 C.F.R. § 580.5; *Moxey v. Jimmy Auto Sale LLC*, 2019 WL 1399556, at *4 (D.N.J. Mar. 28, 2019)) and prohibits a person from "disconnect[ing], reset[ting], alter[ing], or hav[ing] disconnected, reset, or altered, an odometer of a motor vehicle intending to change the mileage registered by the odometer" among other things. (49 U.S.C. § 32703; *see also Moxey*, 2019 WL 1399556, at *3-4.)

The Dealer is correct Vartelov fails to plead (or respond to its motion for summary judgment with) the section of the Odometer Act it purportedly violated. (ECF 15; ECF 27 at 11-12.) Although Vartelov is represented by counsel, and not proceeding *pro se*, the Court liberally construes Vartelov's pleading to allege the Dealer violated the Odometer Act by failing to provide the required odometer disclosures and by tampering with the odometer to make it seem as though the Vehicle had only 2,776 miles on it, not 4,921 as indicated on the Vehicle Use Agreement Vartelov found in his glove box. There is no record evidence supporting Vartelov's claims, and the Court grants summary judgment in the Dealer's favor.

The Court begins with Vartelov's claim the Dealer tampered with the odometer on the Vehicle. Vartelov must prove the Dealer altered or tampered with the odometer of the Vehicle intending to change the mileage registered on it and did so with the intent to defraud. *Moxey*, 2019 WL 1399556, at *3; 49 U.S.C. § 32703. Vartelov's claim is premised on the Vehicle Use Agreement he found in his glove box stating the Vehicle's mileage was 4,921 on December 9, 2020, as opposed to the purchase paperwork which records the Vehicle's miles as 2,776 several months later. Vartelov's supporting evidence includes this mileage discrepancy and testimony from the Dealer's employees they could not confirm the 2,776 miles was the accurate mileage at the time of sale. The discrepancy in mileage does not itself evidence tampering with or altering of the odometer. But even if it did, no reasonable jury could conclude the Dealer tampered with or altered the Vehicle's odometer to change the miles from 4,921 to 2,776 based on the unrebutted evidence in the record because it is clear several clerical errors made in the computer system created the discrepancy. And Jim Marr, the Dealer's service manager and corporate designee, confirmed the Vehicle had 2,776 miles on June 7, 2021 when Vartelov purchased it. (ECF 24 at 161-62, Marr Dep., 48:7-49:14.) Because there is no evidence of alteration and/or tampering with the odometer of the Vehicle, the Court grants summary judgment in favor of the Dealer.

A review of each of the three information sources for the Vehicle's mileage—the computer-generated Vehicle usage report (Ex. H.), the Vehicle Use Agreements (Ex. J), and the check-in forms (Ex. J)—shows that odometer tampering or altering is not the mileage discrepancy's cause. The mileage discrepancy on the Vehicle usage report begins with customers Snellings and Yu because the handwritten check-in forms record more miles than were inputted into the Dealer's computer system. (ECF 24 at 184, 187 (customer Snellings Vehicle Use Agreement and check in form with handwritten mileage as 315 miles) *compare* ECF 24 at 171

(vehicle usage report recording miles in as 306); ECF 24 at 185, 188 (customer Yu Vehicle Use Agreement and check in form with handwritten mileage as 329 miles) *compare* ECF 24 at 171 (vehicle usage report recording miles in as 307).) But the real issue causing the dispute before this Court occurs with customer Adler who has two Vehicle Use Agreements: one of which has the Vehicle's mileage handwritten as 337 miles upon its return (ECF 24 at 186) and one which has the "miles driven" typed in as 3,023 miles but leaves the "mileage in" section blank (ECF 24 at 190.)

The typed "miles driven" entry is clearly an error as it is impossible for Adler to have driven over 3,000 miles in twenty-three hours. [7] Using basic math, Adler would have had to drive approximately 131 miles per hour for twenty-three hours straight (or even *faster* for a shorter duration of time) to drive 3,023 miles.[8] No reasonable juror could find this occurred. Additionally, the unrebutted testimony from the Dealer's employees indicates this mileage error was the result of a clerical error which was never corrected because service advisors do not have administrative privileges to fix the mileage of a loaner vehicle once entered into the computer system. (ECF 24 at 143, Grimason Dep., 21:13-22:9; ECF 24 at 157, Marr Dep., 29:7-30:10; 32:17-24; ECF 124 at 171-73 (Ex. H); ECF 124 at 178-79, DiMoreno Dep., 12:21-13:8.) Thus, from Adler's entry onwards, the Vehicle usage report incorrectly lists the "Miles Out" as 3,330 or above (ECF 24 at 171-73 (Ex. H)).[9] That these entries are inaccurate is further buttressed by the handwritten records

---

[7] *FCS Cap. LLC v. Thomas*, 579 F. Supp. 3d 635, 647 (E.D. Pa. 2022) (noting judicial notice is proper on summary judgment, and "[a] court may take judicial notice of facts that are not subject to reasonable dispute because they are . . . 'capable of accurate ready determination by resort to sources whose accuracy cannot reasonably be questioned.'" (quoting *Werner v. Werner*, 267 F.3d 288, 295 (3d Cir. 2001)).

[8] ECF 24 at 190 (noting customer had the car for about 23 hours); *but see* ECF 24 at 186 (noting customer had the car for about 2.5 hours).

[9] Another clear error occurs for customer OSullivan, where the handwritten records indicate she drove 491 miles (ECF 24 at 202, 205 (Ex. J)), but the computer-generated Vehicle usage report indicates she drove 4,911 miles (ECF 24 at 171.) Again, the unrebutted testimony and the

12

indicating the *actual* miles driven by each customer detailed in the chart above—none of which get anywhere near 4,921 miles. (ECF 24 (Ex. J)).

Just as the computer-generated vehicle usage report is incorrect after customer Adler, so too is the "mileage out" section of each Vehicle Use Agreement after customer Adler. Since the computer prints each "mileage out" on the Vehicle Use Agreement based on what is entered into the computer system, each "mileage out" on the Vehicle Use Agreements after Adler is incorrect—including on the Vehicle Use Agreement Vartelov found in his glove box.

The Court lacks the handwritten check-in form for the last customer to use the Vehicle as a loaner, customer Le. But the Dealer performed a used vehicle inspection on January 9, 2021, a few days after Le returned it, and the Vehicle's odometer had 2,776 miles. (ECF 24 at 160-61, Marr Dep., 41:21-42:19, 48:11-15; ECF 25-12.) The Vehicle was not loaned out again after the inspection. (ECF 24 at 161-162, Marr Dep., 48:7-50:1.) Thus, the Vehicle's mileage after Le returned it was no more than 2,776 miles.

Vartelov attempts to create a genuine dispute of material fact by adducing testimony that the Vehicle's odometer reading at the used vehicle inspection was approximately five months before Vartelov purchased it. But Marr testified it is normal for a car to sit on the lot for four to five months before it sells without accruing any miles and the Vehicle's mileage on the date of sale was 2,776. (ECF 24 at 161-62, Marr Dep., 48:7-50:1.) This testimony is unrebutted. Therefore, the Vehicle's mileage on June 7, 2021—the date Vartelov purchased the Vehicle—was 2,776.

Vartelov fails to adduce any evidence of tampering with or alteration of the odometer. Instead, he relies on the mileage discrepancy and argues no one from the Dealer knows the true

---

handwritten records, as summarized by the Court above, confirm the Vehicle never reached 4,911 miles before the Dealer sold it to Vartelov. (ECF 24 at 157, Marr Dep., 32:4-32:24; ECF 24 (Ex. J.))

13

mileage of Vehicle on the date he purchased it. No reasonable juror could conclude the mileage discrepancy was the result of tampering with or alteration of the Vehicle's odometer. The Dealer has demonstrated there is no genuine issue of material fact, and it is entitled to summary judgment because the Vehicle's true mileage on June 7, 2021 was 2,776, and there is no evidence in the record establishing it tampered with or altered the odometer. Thus, the Court grants the Dealer's motion for summary judgment.

The Court next considers Vartelov's claim the Dealer violated the Odometer Act by failing to provide adequate disclosures. He appears to claim the Dealer did not provide the required odometer disclosures and/or the disclosures provided were inaccurate. (ECF 15 ¶¶ 9-12, 28.) For the reasons previously set forth, the mileage listed on the disclosures was accurate. Additionally, it is clear from the record Vartelov received an Odometer Disclosure statement (ECF 24 at 44, Vartelov Dep., 39:18-41:8; ECF 24 at 135), and there is no evidence the mileage was not disclosed on the Vehicle's title. *See, e.g.*, *Moxey*, 2019 WL 1399556, at *4; 48 U.S.C. § 32705(a); 49 C.F.R. § 580.5. The record—including all the deposition testimony submitted by the parties—does not include the Vehicle's title and is devoid of any discussion of the mileage disclosed on it. Thus, to the extent Vartelov's Odometer Act is premised on a failure to provide the required disclosures and/or the disclosure being false, the Dealer is entitled to summary judgment because there is no evidence the required odometer disclosure was inaccurate or not adequately provided.

### B. The Court declines to exercise supplemental jurisdiction over Vartelov's remaining state law claims.

Having granted summary judgment on the only claim providing this Court original jurisdiction, the Court declines to continue to exercise supplemental jurisdiction over the remaining state law claims under 28 U.S.C. § 1367(c).

"Supplemental jurisdiction 'is a doctrine of discretion, not a matter of plaintiff's right.'" *Bloom v. Indep. Blue Cross*, 340 F. Supp. 3d 516, 525 (E.D. Pa. 2018) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)). "[D]istrict courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . (3) the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). The Third Circuit has held "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court *must* decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (quoting *Borough of W. Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995) (emphasis in original)); *see also Dirauf v. Berger*, 57 F.4th 101, 108 n.6 (3d Cir. 2022); *N. Sound Cap. LLC v. Merck & Co.*, 938 F.3d 482, 494 n.11 (3d Cir. 2019). There is no affirmative justification for continuing to exercise supplemental jurisdiction over the state law claims, and they are dismissed without prejudice to be refiled in the appropriate state forum.

Vartelov's state law claims are premised on both the unproven Odometer Act violation and an entirely different theory—the Dealer committed a UTPCPL violation and fraud by representing the Vehicle had one owner and not disclosing its loaner use at the time of sale. Vartelov may still bring state law claims premised on the Dealer's failure to disclose the Vehicle's "prior use" in the appropriate forum. 28 U.S.C. § 1367(d); *see also* 42 Pa. Cons. Stat. § 5527(b); *Morse v. Fisher Asset Mgmt., LLC*, 206 A.3d 521, 526 (Pa. Super. 2019) (six-year statute of limitations for UTPCPL claim); 42 Pa. Cons. Stat. § 5524(7); *LabMD Inc. v. Boback*, 47 F.4th 164, 182 (3d Cir. 2022) (two-year statute of limitations for fraud claims under Pennsylvania law). While dismissal will delay a decision on the remaining summary judgment issues raised here, the facts developed

15

during discovery and the parties' arguments raised in their briefing will remain the same in state court. *See, e.g.*, *Makwana v. Medco Health Servs., Inc.*, No.14-7096, 2016 WL 7477755, at *4-5 (D.N.J. Dec. 28, 2016); *see also Bloom*, 340 F. Supp. 3d. at 525 (declining to exercise supplemental jurisdiction over state law claims at summary judgment stage). Dismissing the state law claims (which now predominate over this litigation) serves the goals of judicial economy and comity by allowing Pennsylvania courts to apply Pennsylvania law to this dispute between two Pennsylvania citizens. *Makwana*, 2016 WL 747755, at *4-5. Considerations of judicial economy, convenience, and fairness do not weigh in favor of exercising supplemental jurisdiction. The Court declines to exercise supplemental jurisdiction over the remaining state law claims and dismisses them without prejudice. *Hedges*, 204 F.3d at 114-15, 123-24; *Garges v. People's Light & Theatre Co.*, 529 F. App'x 156, 163-64 (3d Cir. 2013), *judgment entered*, No. 13-1160, 2013 WL 3455818 (3d Cir. June 28, 2013) ("Here, the District Court dismissed all of the remaining state and common law claims after awarding summary judgment to the defendants on all of the federal claims over which it had original jurisdiction. Clearly, the District Court's determination not to exercise pendent jurisdiction over Garges' [remaining state law claims] was not an abuse of discretion because the legal standards that apply to these claims differ from the standards that apply to Garges' federal claims."); *Dasti v. Bloom Auto Sales*, No. 19-10417, 2021 WL 7081336, at *3 (D.N.J. Nov. 22, 2021) (declining to exercise supplemental jurisdiction over state law claims at summary judgment stage); *Borders v. Borough*, No. 17- 04429, 2019 WL 2613270, at *3 (E.D. Pa. June 25, 2019) (same); *Wanner v. Grant Shook*, No. 16- 00389, 2018 WL 585701, at *3 (M.D. Pa. Jan. 29, 2018) (same); *Makwana*, 2016 WL 747755, at *4-5 (same); *Smith v. Zeeky Corp.*, No. 09-4253, 2010 WL 1878716, at *8 (E.D. Pa. May 7, 2010) (same). The parties' cross motions for summary judgment as to the UTPCPL and fraud claims are therefore denied as moot.

## IV. Conclusion

The Court grants the Dealer's Motion for summary judgment on Vartelov's Odometer Act claim. It declines to exercise supplemental jurisdiction over the remaining state law claims and dismisses them without prejudice. The parties' cross motions on the state law claims are denied as moot.

An appropriate Order consistent with this Memorandum follows.